UNITED STATES of America,
Plaintiff-Appellee,

v.

YOUNG BROTHERS, INC., Contractors,
Defendant-Appellant.

No. 83–1174.

United States Court of Appeals,
Fifth Circuit.

March 19, 1984.

As Amended on Denial of Rehearing and
Rehearing En Banc
May 21, 1984.

Frank Maloney, David L. Botsford, Austin, Tex., for defendant-appellant.

Frederic Freilicher, John J. Powers, III, Attys., Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before BROWN, REAVLEY and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge.

Appellant, Young Brothers, Inc., Contractors,[1] was convicted by jury of violating § 1 of the Sherman Act, 15 U.S.C. § 1, by conspiring to submit collusive, non-competitive "rigged" contract bids for a state highway construction project and also of violating 18 U.S.C. § 1341 by using the mails to defraud in furtherance of the conspiracy. Appellant appeals the convictions, challenging (1) the sufficiency of the evidence; (2) the jury instructions; (3) the court's exclusion of certain grand jury testimony; and (4) various evidentiary rulings. Finding no reversible error on any of these challenges, we affirm.

---

1. Appellant is a corporation engaged in the highway construction business in Texas. At the time of the events involved in this case, Francis M. Young was the president of the corporation and John Miller was the vice-president.

## FACTS

Through a three-member Highway Commission, the State of Texas contracts with various firms to perform highway construction work. Texas law mandates that highway contracts be awarded on the basis of sealed competitive bids submitted by the various construction contractors. In June 1977, the Highway Department put up for bid a seal coat job to be completed on 63 miles of highway located primarily in Gillespie County, Texas.[2] The bids were to be received no later than 9:00 a.m. on June 23, 1977, at the Highway Department in Austin, Texas.

After the Texas Highway Department announced bidding on the Gillespie County job, Gerald Gold, president of Gold Paving Aggregate, Inc., a highway construction company, telephoned John Miller, appellant's vice president. Although Gold was interested in doing the Gillespie County job, he was not qualified to bid on it because at that time his company was primarily in the sand, gravel, and paving business. He therefore asked Miller if appellant corporation would agree to submit a bid and, if the bid was successful, to subcontract the work to Gold.[3] It was agreed that appellant would bid the job and that Gold would deliver his estimate to Miller in Austin the night before the bid deadline.

On the evening of June 22, Gold accordingly delivered a bid estimate to Miller. Gold's original estimate was approximately $410,000. When Miller indicated he thought the job would go somewhat higher, Gold responded that a bid in the $420,000 "range . . . was a good idea." Although no final figure was decided on at the meeting, the two men parted with the understanding that Miller would submit a bid for Gold. The bid actually submitted by appellant was $461,797.50, more than $9,000.00 above

the low bid of $452,221.22 (submitted by Brannon Contractors, Inc.), and more than $50,000.00 above Gold's original estimate.

The evidence adduced at trial showed that the reason appellant had submitted a bid so far above Gold's estimate was that, unknown to Gold, appellant and others had "rigged" the bid. The bid submitted by appellant was a "complimentary bid" designed to deceive state officials into believing that the project had been bid competitively. This conspiracy was organized by W.J. Brannon, Sr., president of Brannon Contractors, Inc., and his son, W.J. Brannon, Jr.[4]

On June 21, 1977, the Brannons went to Austin. Using the Highway Department list of those who had requested bid proposals on the Gillespie County job, they spent the next day contacting the contractors on the list to determine whether they intended to bid on the Gillespie County project. Their objective was to "set up the job" by persuading potential bidders not to submit a bid or to submit a complimentary bid that was higher than the bid submitted by Brannon Contractors. After talking to some contractors who expressed no interest in bidding on the Gillespie County job, Brannon, Sr. spoke to Jack Schwope of Schwope, Inc., and Keith Keller of the Allen Keller Company. Both informed Brannon they intended to bid on the job. Brannon was able to persuade both Schwope and Keller not to turn in competitive bids, but instead to make complimentary bids so that Brannon Contractors would be assured of being the low bidder.

On the night before the bid deadline, Brannon, Sr. met with appellant's vice president, John Miller, in Miller's hotel room. Brannon informed Miller that he "had everyone off the job" and that he would

---

**2.** A seal coat job involves the application of liquid asphalt on the road surface on top of which is placed a layer of either crushed rock, gravel, or stone. This process seals the road surface, preventing moisture from penetrating, and also may improve the skid characteristics of the road.

**3.** The Texas Highway Department regulations did not prohibit successful bidders from subcontracting the projects to other contractors.

**4.** Neither Miller nor Young testified at trial. Thus, most of the facts relating to the actual making of the bidrigging agreement were established to the satisfaction of the jury through the testimony of the Brannons.

"appreciate it" if Miller "would go along and not bid the job competitive." After Miller told Brannon he was under instructions from appellant's president, Francis Young, to place a competitive bid, Brannon asked Miller to telephone Young so that Brannon could talk to him. During the telephone conversation, Young informed Brannon that he was actually bidding the job for Gold and that Young Brothers "needed to make some money" because it "hadn't had a whole lot of work." Young finally agreed not to bid the job competitively in return for $10,000. Young, without request from Brannon, added that he would like to turn in a complimentary bid. They agreed at that time that after Brannon was awarded the job, Young would send Brannon a bill for "rental equipment" and that the bill would be for ten thousand plus "some odd dollars."

The next morning, prior to the bid deadline, Brannon, Jr. contacted Miller, Schwope, and Keller and gave them the necessary complimentary bid figures. Schwope accordingly bid $471,498.00; appellant bid $461,797.50; Allen Keller bid $458,799.50; and Brannon bid $452,221.22. Brannon, the low bidder, was awarded the Gillespie County job. Brannon Contractors subsequently performed the work, earning a profit of $135,000.

After the job was awarded, on July 28, 1977, Brannon, Jr. called Miller at appellant's offices in Waco, Texas. Miller transferred Brannon's call to Oliver Rudolff, appellant's comptroller. While transferring the call, Miller advised Rudolff that Brannon wanted to give Rudolff billing instructions. Brannon, accordingly, instructed Rudolff to send him an invoice for $10,001. Brannon asked Rudolff to show on the invoice that the $10,001 was for the rental of equipment for use in constructing a sub-division in Victoria, Texas. Pursuant to Brannon's request, an invoice was prepared and mailed to Brannon Contractors on or about July 30, 1977. On August 10, 1977,

after receiving the invoice, Brannon Contractors mailed a check made out to appellant for $10,001. The check was deposited in the appellant's bank account in the normal course of business. At no time did Brannon Contractors actually rent any equipment or receive any services from appellant for the Victoria subdivision.

In a three-count indictment, appellant Young Brothers, Inc., Contractors, John W. Miller, appellant's vice president, Brannon Contractors, Inc., and various unindicted co-conspirators were charged with (1) engaging in a conspiracy in violation of § 1 of the Sherman Act (15 U.S.C. § 1) (count one); and (2) using the United States mail in a scheme to defraud the State of Texas in violation of 18 U.S.C. § 1341 (counts two and three). Appellant's president, Francis M. Young, was separately indicted for the same offenses. The indictments were subsequently consolidated for trial. Prior to the trial, the district court accepted a guilty plea from Brannon Contractors, Inc. to count one of the indictment and sentenced it to pay a fine of $200,000, later reduced to $150,000.[5] The jury returned verdicts of innocent on all counts with respect to defendants Miller and Young, and guilty on all counts with respect to appellant, Young Brothers. Appellant was sentenced to pay a $750,000 fine on count one and a $1,000 fine on each of counts two and three.

## SUFFICIENCY OF THE EVIDENCE

Appellant argues that the evidence is insufficient to support its conviction unless the evidence excludes every reasonable hypothesis of innocence, presumably on the theory that if there is such a reasonable hypothesis the jury must have had a reasonable doubt of appellant's guilt. Specifically appellant contends that a reasonable hypothesis of innocence was not excluded by the evidence adduced at trial: that Miller and Young feigned agreement with the Brannons, disregarded the figure supplied by them, competitively bid the project to

5. Pursuant to a plea bargaining agreement, counts two and three were dismissed against Brannon Contractors in exchange for its agree-ment to cooperate fully with the government's investigation of the Texas highway construction industry.

honor the pre-existing agreement with Gold, had no intention of approaching the Brannons for the $10,000, and were "amazed" when Brannon, Jr. arranged to pay the appellant.

■ Appellant has not stated the correct standard of review for sufficiency of the evidence. "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Bell,* 678 F.2d 547, 594 (5th Cir.1982) (en banc), *aff'd,* —— U.S. ——, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983); *accord United States v. Sneed,* 705 F.2d 745, 749 (5th Cir.1983); *United States v. Shaw,* 701 F.2d 367, 394 (5th Cir.1983).[6] It is within the jury's province to choose among reasonable constructions of the evidence. As an appellate court, we must view the evidence in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942) and accept all credibility choices and reasonable inferences the jury could have made to support its verdict. We may reverse only upon concluding that a reasonable jury would have been compelled to find that guilt was not proved beyond a reasonable doubt. *United States v. Saxton,* 691 F.2d 712, 713 (5th Cir.1982).

■ "Conspiracies between firms to submit collusive, noncompetitive, rigged bids are *per se* violations" of the Sherman Act. *United States v. Flom,* 558 F.2d 1179, 1183 (5th Cir.1977). In order to prove that appellant actually intended to enter into the bidrigging conspiracy, the government was required to show that appellant knowingly joined or participated in the conspiracy. *United States v. Cargo Service Stations,*

*Inc.,* 657 F.2d 676, 681 (5th Cir.1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982). Appellant argues that while the testimony of Brannon, Jr. and Brannon, Sr. reflected that they both were of the impression that Miller and Young had agreed to submit a noncompetitive bid, this testimony alone was insufficient to show that appellant actually intended to participate in the conspiracy.

"Intent in antitrust cases, as in all cases, is a question to be resolved by the trier of fact after consideration of all the evidence." *Cromar Company v. Nuclear Materials & Equipment Corp.,* 543 F.2d 501, 511 (3d Cir. 1976). We find that the evidence in its entirety was sufficient for the jury reasonably to conclude that appellant intentionally and knowingly participated in the bidrigging conspiracy.

Brannon's uncontested testimony shows that Young at least overtly agreed with Brannon to submit a complimentary bid in return for just over $10,000, to be billed by appellant as rental equipment. The uncontroverted evidence also shows that on the morning of June 23, 1977, Brannon, Jr. gave Miller the necessary figure to turn in a complimentary bid. Appellant does not dispute that Brannon was actually the low bidder on the job. Finally, the record shows without dispute that appellant sent Brannon an invoice for $10,001 for a fictitious rental of equipment and that Brannon sent appellant a check for $10,001 which appellant deposited in its bank account.

■ Appellant presents several contentions to support its claim that Young and Miller merely feigned agreement with the Brannons and actually bid the job competitively. First, appellant maintains that the bid of $461,797.50 actually submitted by Miller was in line with Gold's original figure of $410,000 to $420,000, when appel-

---

6. The standard for sufficiency of the evidence cited by the appellant was the standard formerly used by this Circuit in cases where the government's proof was based primarily upon circumstantial evidence. This Court no longer makes a distinction in the burden of proof required in cases based upon circumstantial evidence and those based upon direct evidence.

The standard for testing sufficiency of the evidence which we cite in the text applies to either type of case. *See United States v. Bell, supra,* 678 F.2d at 549 n. 3. In any event, it is clear that the government's proof in the instant case was based primarily upon direct testimony by those who participated in the bidrigging scheme.

lant's 10% fee for bidding the job is added. However, the record shows that Gold testified that the figures he gave Miller included "what [Gold] thought it would take to do the job plus [appellant's] 10 percent fee," although Gold conceded on cross-examination that Miller may have been unclear on this point. The record also shows that Miller and Gold together went over Gold's estimate on the bid items.

Second, appellant contends the evidence shows that Miller was surprised when Brannon called requesting to be billed for $10,001. Presumably, appellant seeks to demonstrate that Miller believed he had never reached agreement with Brannon to rig the Gillespie County bid, and that Brannon, therefore, owed appellant nothing. The record shows, however, appellant's consistent practice was to return any overage to overpaying customers. In Brannon's case Miller never instructed Rudolff not to bill Brannon and did not direct Rudolff to return the $10,001 check to Brannon.

■ Finally, appellant contends that one can reasonably conclude that the jury accepted appellant's version of the evidence with respect to Miller and Young because it acquitted them. No conclusion may be drawn as to how the jury viewed the evidence based on its acquittal of Miller and Young. It is well settled that "[i]n this Circuit consistency [of verdicts] is not required." *United States v. Cargo Service Stations, Inc., supra,* 657 F.2d at 685; *accord Dugan Drug Stores v. United States,* 326 F.2d 835, 837 (5th Cir.1964). Thus, it is immaterial "[w]hether the jury's verdict was the result of carelessness or compromise" or a belief that the corporation should be penalized rather than the individual defendants. "Juries may indulge in precisely such motives or vagaries," and no inferences favorable to corporate defendants should be drawn from allegedly inconsistent verdicts. *United States v. Dotterweich,* 320 U.S. 277, 279, 64 S.Ct. 134, 135, 88 L.Ed. 48 (1943); *United States v. Cargo Service Station, Inc., supra,* 657 F.2d at 685.

■ It is the jury's province to judge the credibility of the witnesses. They appar-

ently chose to believe the Brannons' testimony as to the facts surrounding the making of the agreement. Moreover, aside from the Brannons' testimony, there was evidence that appellant received and deposited the $10,001 check from Brannon Contractors. Even though some of the evidence relating to the payment was circumstantial, a jury may base its finding of the requisite intent for violation of § 1 of the Act in whole or in part upon circumstantial evidence. *United States v. Cargo Service Stations, Inc., supra* 657 F.2d at 683 n. 5; *Pan-Islamic Trade Corp. v. Exxon Corp.,* 632 F.2d 539, 558 (5th Cir.1980), *cert. denied,* 456 U.S. 927, 102 S.Ct. 427, 70 L.Ed.2d 236 (1981).

■ Appellant also challenges the sufficiency of the evidence on count one by making a detailed assertion that the evidence was insufficient to support a finding that the alleged conspiracy occurred in or affected interstate commerce. Section 1 of the Sherman Act prohibits conspiracies "in restraint of trade or commerce among the several states." This language has been construed by the courts to prohibit restraints that either occur in the flow of interstate commerce or that substantially affect interstate commerce. *Burke v. Ford,* 389 U.S. 320, 321, 88 S.Ct. 443, 444, 19 L.Ed.2d 554 (1967); *United States v. Cadillac Overall Supply Co.,* 568 F.2d 1078, 1082 (5th Cir.) *cert. denied,* 437 U.S. 903, 98 S.Ct. 3088, 57 L.Ed.2d 1133 (1978). Proof under either the "flow" theory or the "affect" theory is sufficient to sustain a conviction under the Act. *Battle v. Liberty National Life Insurance Co.,* 493 F.2d 39, 47 (5th Cir.1974), *cert. denied,* 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807 (1975).

■ The government demonstrated that portions of U.S. Highway 290 were seal coated as part of the Gillespie County job. U.S. 290 also connects directly with Interstate Highway 10 in two places. An average of 55 out-of-state vehicles passed over the seal-coated segment daily in 1977. Furthermore, the evidence showed that in completing the seal coat job, Brannon Con-

tractors used heavy equipment that was purchased and delivered directly from out-of-state sources.[7] It has been held that a conspiracy to restrain trade in intrastate activity can affect trade in interstate activity sufficiently to trigger Sherman Act jurisdiction. *Lehrman v. Gulf Oil Corp.,* 464 F.2d 26, 36 (5th Cir.), *cert. denied,* 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972). The bidrigging conspiracy in which appellant was involved affected competition in the interstate marketing of heavy equipment because equipment suppliers were forced to bargain with a contractor who, as a result of an unlawful conspiracy, possessed a monopolistic position as a buyer or lessee of heavy construction equipment. "The focus of the [A]ct is to protect interstate trade from interferences of all degrees of subtlety." *Ibid.* As the Supreme Court has stated, "[i]f it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze." *United States v. Women's Sportswear Association,* 336 U.S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805 (1949).

Taking the view most favorable to the government, we conclude that the evidence in the aggregate amply supports a finding that the bidrigging conspiracy substantially affected interstate commerce. *See Glasser, supra,* 315 U.S. at 80, 62 S.Ct. at 469. This conclusion is in keeping with the Congressional policy to exercise "the utmost extent of [Congress'] Constitutional power in restraining trust and monopoly agreements." *Gulf Oil Corp. v. Copp Paving Company, Inc.,* 419 U.S. 186, 194, 95 S.Ct. 392, 398, 42 L.Ed.2d 378 (1974).

Finally, appellant challenges the sufficiency of the evidence on the mail fraud charges (counts two and three). As appellant correctly contends, the government was required to show that the mailings (relating to the billing and payment of the $10,001) were "in furtherance" of the bidrigging scheme. *United States v. Rodgers,* 624 F.2d 1303, 1309 (5th Cir.1980), *cert. denied sub nom., Anthony J. Bertucci Construction Co. v. United States,* 450 U.S. 917, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981); *United States v. Buchanan,* 544 F.2d 1322, 1325 (5th Cir.), *cert. denied,* 432 U.S. 907, 97 S.Ct. 2953, 53 L.Ed.2d 1080 (1977). It is appellant's position that the mailings could not have been in furtherance of the scheme since they occurred after the June 23 bid deadline.

There is no set span of time within which mailings must occur to be considered in furtherance of an illicit scheme. It is clear, however, that the mere fact that the use of the mails occurred after the bid deadline does not bar recognition that the use was in furtherance of the conspiracy. The Supreme Court has held that the mailings must be "sufficiently closely related" to the scheme. *United States v. Maze,* 414 U.S. 395, 399, 94 S.Ct. 645, 648, 38 L.Ed.2d 603 (1974). It is enough that use of the mails could have been reasonably foreseen by those engaged in the scheme, or that the mailings were "incident to an essential part of the [bidrigging] scheme." *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954); *see also United States v. Shepherd,* 511 F.2d 119, 121 (5th Cir.1975); *United States v. Knight,* 607 F.2d 1172, 1175 (5th Cir.1979).

The $10,001 pay-off was a planned and established part of the full bidrigging scheme. Indeed, since the evidence showed that Young requested the payment, it reasonably can be inferred that Young would not have agreed to the scheme on behalf of his company without being paid. Moreover, since both Brannon and Young agreed to the fraudulent billing arrangement, and since their headquarters were geographical-

7. The government was not required to prove that appellant, Young Brothers, made the purchases of equipment in interstate commerce as long as it proved that one or more other co-conspirators made such purchases. *See, e.g., United States v. Foley,* 598 F.2d 1323, 1328 (4th Cir.1979), *cert. denied,* 444 U.S. 1043, 100 S.Ct. 727, 62 L.Ed.2d 728 (1980); *United States v. Wilshire Oil Co.,* 427 F.2d 969, 974 (10th Cir.), *cert. denied,* 400 U.S. 829, 91 S.Ct. 58, 27 L.Ed.2d 59 (1970).

ly apart,[8] both could reasonably have foreseen that they would use the mails for the billing and the payoff.

In sum, the government's evidence showed that the use of the mails for the $10,001 payment to appellant was made in satisfaction of Brannon's obligation to compensate appellant for not bidding the job competitively. It follows that the payment was an integral part of the scheme to defraud the State. We conclude that the evidence was clearly sufficient for the jury reasonably to conclude that the mailings were in furtherance of the bidrigging scheme.

## EXCLUSION OF GRAND JURY TESTIMONY

Appellant attempted to introduce at trial the grand jury testimony of Keith Allen Keller and James Kemp, employees of the Allen Keller Company. The evidence showed, as set out above, that the Allen Keller Company also conspired with Brannon to submit a non-competitive bid. In grand jury testimony, these two men denied ever talking to Brannon about rigging the bid. When appellant attempted to call Keller and Kemp as witnesses, each indicated that if called to testify he would invoke his privilege against self-incrimination. Appellant argues that this made Keller and Kemp "unavailable" as witnesses under Federal Rule of Evidence 804(a)(1) and that the court therefore should have permitted the introduction of their grand jury testimony under the "former testimony" hearsay exception of Rule 804(b)(1).[9] The court excluded the grand jury testimony, holding that a witness who claims the privilege

against self-incrimination does not become "unavailable" so that former testimony becomes admissible under Rule 804(b)(1).

Resolution of the issue of the admissibility of the former grand jury testimony of Keller and Kemp requires us to determine (1) whether Rule 804(a)(1) applies to a witness who is unavailable due to his invoking the privilege against self-incrimination; (2) whether the district court was required to make a formal ruling on the validity of the privilege before a witness could be considered unavailable; and (3) once it is determined that a witness is unavailable under 804(a)(1), whether grand jury testimony is properly considered former testimony under Rule 804(b)(1).

█ Turning to the first of these inquiries, we held in a similar situation in *United States v. Thomas*, 571 F.2d 285, 288 (5th Cir.1978):

Weeks did not take the stand, obviously relying on the privilege against self-incrimination. His unavailability based on the Fifth Amendment privilege satisfies 804(a)(1).

Thus, it is clear that a witness who is unavailable because he has invoked the Fifth Amendment privilege against self-incrimination is unavailable under the terms of 804(a)(1).

The government argues, however, that in order for a witness to be unavailable under the rule, the witness claiming the Fifth Amendment privilege must be exempted from testifying by a ruling of the court. The government contends that the appellant never tendered Keller or Kemp for questioning so that the district court could

---

**8.** Brannon Contractors, Inc. was located in Victoria, Texas; Young Brothers, Inc., Contractors was located in Waco, Texas.

**9.** Rule 804(a)(1) provides:

(a) **Definition of availability.** "Unavailability as a witness" includes situations in which the declarant—

(1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of his statement.

Rule 804(b)(1) provides:

(b) **Hearsay exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness.

(1) **Former testimony.** Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

rule on the validity of their asserted privilege. In *Thomas,* we further held:

Rule 804(a)(1) requires an express assertion of the privilege and a ruling by the court that the privilege constitutes unavailability, *see* 4 Weinstein's Evidence ¶ 804(a)[01] (1976), but here the existence of the privilege and Weeks' right to assert it and Weeks' unavailability as a witness are patent. The trial court declared the evidence inadmissible before reaching issues raised by Rule 804. It would be mere formalism to abjure the merits of [defendant's] claim in these circumstances. *See U.S. v. Oropeza,* 564 F.2d 316, 325 n. 8 (CA 9, 1977).

*Ibid.*

█ Thus, although Rule 804(a)(1) literally requires the court to rule upon the validity of the witness' assertion of the privilege, our ruling in *Thomas* indicates that such a requirement need not be met when its fulfillment would be a mere "formalism." It is clear from the record that the district court assumed a proper claim of the privilege had been made but held that the claim did not render the witnesses unavailable. The court simply concluded that Rule 804(a)(1) did not have application to unavailability because of the claim of Fifth Amendment privilege. As in *Thomas,* the "trial court declared the evidence inadmissible before reaching issues raised by Rule 804." We, therefore, conclude that it was unnecessary for the court to have ruled with more specificity as to the validity of Kemp's and Keller's asserted privilege against self-incrimination. It was clear to all participants that each claim would have been made. In fact, the government stipulated at trial that Kemp and Keller would assert their Fifth Amendment privilege if called to testify.

█ We decide, therefore, that Kemp and Keller were unavailable as witnesses within the meaning of Rule 804(a)(1). This leaves us with the difficult question whether the Rule 804(b)(1) definition of "former testimony" includes grand jury testimony. The typical situation encompassed by Rule 804(b)(1) is testimony which was elicited in a former adversarial hearing. The importance of the former hearing being adversarial in nature is to insure that the party against whom the former testimony is offered at trial had an opportunity to confront the witnesses at the former hearing.[10] This concern is not present in this case because it was the party offering the testimony, the appellant, who had not had the opportunity to cross-examine. Appellant was waiving its right of confrontation. The party against whom the testimony was being offered at trial, the government, had an opportunity to question the witnesses fully during the grand jury hearing.

We conclude, however, that we need not decide whether the district court should have admitted the grand jury testimony under the former testimony hearsay exception. Even if the testimony should have been admitted, the error was harmless. Appellant argues that the exclusion of the grand jury testimony was harmful on the theory that Brannon could not have actually rigged the bid without eliminating all potential bidders. Therefore, the grand jury testimony would have provided evidence to substantiate appellant's defense posture that it had not entered into an agreement with Brannon and had no intention to defraud the State.

We reject this argument. First, the government stipulated that Kemp and Keller had appeared before the grand jury and had denied any knowledge of or participation in any type of bidrigging scheme. Second, the district court instructed the jury on appellant's defensive theory—"that none of [the defendants] knowingly or willfully entered into any agreement or any scheme or artifice to defraud the State of Texas" or to "submit collusive, non-competitive highway construction bids." This instruction was given in keeping with the appellant's right "to have [its] theory of the case, if it could amount to a lawful

10. This concern is evidenced by the rule's requirement that the person against whom the evidence is offered at trial must have had an opportunity to develop the witness's testimony at the former hearing "by direct, cross, or redirect examination." *See supra* note 9.

defense, fairly submitted to the consideration of the jury." *United States v. Flom, supra,* 558 F.2d at 1185. Most important, the evidence undisputedly showed that notwithstanding any participation or nonparticipation by Kemp and Keller, appellant made an agreement with Brannon to submit a noncompetitive bid and in return received $10,001. The evidence surely was sufficient for the jury reasonably to conclude that appellant participated in the bidrigging scheme even if the members of the jury were not convinced that Kemp and Keller had also participated. The admission of grand jury testimony under Rule 804(b)(1) is a difficult question even when there is no confrontation issue. We do not go out of our way to decide it since in this case if there was error it was harmless.[11]

## EXCLUSION OF EXPERT TESTIMONY

■ Appellant contends that the district court erred in excluding the testimony of Joe Wells, an accountant, who was tendered by appellant as an expert on the question of the reasonableness of the bids submitted for the Gillespie County project. Wells purportedly would have testified that the costs involved in completing the Gillespie County job would have exceeded Gold's estimate, and that a bid of $460,000 was a reasonable bid for the job.

"The expert qualification of a witness is a question for the trial judge, whose discretion is conclusive unless clearly erroneous as a matter of law." *United States v. Crosby,* 713 F.2d 1066, 1076–77 (5th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 506, 78 L.Ed.2d 696 (1983); *see also United States v. Johnson,* 575 F.2d 1347, 1360 (5th Cir. 1978), *cert. denied,* 440 U.S. 907, 99 S.Ct. 1213, 59 L.Ed.2d 454 (1979). The district court was well within its discretion in excluding Wells's testimony on the grounds that he was not qualified to give an expert

---

**11.** We note that the reported federal circuit court cases which have admitted grand jury testimony of an unavailable witness have all done so under 804(b)(5). *See United States v. West,* 574 F.2d 1131, 1134 (4th Cir.1978); *United States v. Carlson,* 547 F.2d 1346, 1353 (8th Cir.1976), *cert. denied,* 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977); *United States v. Boulahanis,* 677 F.2d 586, 588 (7th Cir.), *cert. denied,* 459 U.S. 1016, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982); *United States v. Barlow,* 693 F.2d 954, 961 (6th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983), *United States v. Garner,* 574 F.2d 1141, 1144 (4th Cir.), *cert. denied,* 439 U.S. 936, 99 S.Ct. 333, 58 L.Ed.2d 333 (1978).

Rule 804(b)(5) provides:

**(5) Other exceptions.** A statement not specifically covered by any of the foregoing exceptions [i.e., former testimony, statement under belief of impending death, statement against interest, or statement of personal or family history] but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

While there is no Fifth Circuit case in which we admit grand jury testimony of an unavailable witness under 804(b)(1) or (5), in *United States v. Thevis,* 665 F.2d 616, 627 (5th Cir.), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982), grand jury testimony was offered by the government against the defendant. We found that the defendant had waived his confrontation rights because he had murdered the government's witness. We further held that Thevis's waiver of his right of confrontation also constituted a waiver of any hearsay objections. Thus, we upheld the trial court's admission of the grand jury testimony on grounds independent of the hearsay exceptions contained in Rule 804(b). However, with regard to the issue on the admissibility of grand jury testimony under Rule 804(b)(5), we stated generally that if grand jury testimony meets the stringent reliability standards of Rule 804(b)(5), it is admissible even if a defendant makes no express or implied waiver of his confrontation rights. *See also United States v. Gonzalez,* 559 F.2d 1271, 1273 (5th Cir.1977) (grand jury testimony excluded because it failed to meet the reliability standards of 804(b)(5)).

We recognize that the issue of prior grand jury testimony will almost always arise under 804(b)(5) because of the confrontation problem which, however, is not present in this case.

opinion on the reasonableness of bids submitted for highway construction jobs. The record shows that prior to trial Wells had never worked as a highway contracting estimator, had never done a special study of the field, and had no expertise in estimating other than what he had gained in his preparation for his trial testimony.

## MOTION TO AMEND INDICTMENT

Appellant contends that the district court erred in granting the government's mid-trial motion to amend the indictment by changing "Young Brothers, Inc." to "Young Brothers, Inc. Contractors". At the time of the alleged conspiracy there was no corporation with the name "Young Brothers, Inc." There was, however, a "Young Brothers, Inc. Contractors" that had two subsidiaries, "Young Bros. Corporation" and "Young Equipment Company." Of the three, only Young Brothers, Inc., Contractors actually did highway construction work during the period in question and was qualified to enter bids for Highway Department jobs.

■■■ The form of an indictment may be amended without return to the grand jury so long as its substance remains the same. *Russell v. United States,* 369 U.S. 749, 770, 82 S.Ct. 1038, 1050, 8 L.Ed.2d 240 (1962). A misnomer is a mistake of form which may be corrected by amending the indictment. *See, e.g., Williams v. United States,* 179 F.2d 656, 659 (5th Cir.1950), aff'd, 341 U.S. 97, 71 S.Ct. 576, 95 L.Ed. 774 (1951). An amendment will be allowed if a defendant's rights are not affected and he is adequately apprised of the charges against him so that he is protected against surprise at trial or another prosecution for the same offense. *Berger v. United States,* 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935); *United States v. Cook,* 586 F.2d 572, 575 (5th Cir.1978), cert. denied, 442 U.S. 909, 99 S.Ct. 2821, 61 L.Ed.2d 274 (1979).

■■■ The legal requirements have been satisfied in this case. As the district court found, the indictment merely corrected a misnomer. Appellant was not surprised or prejudiced by the change. Of the three companies owned by the Young brothers, Young Brothers, Inc., Contractors was the only entity set up to do highway construction work and to submit bids. It was plain, therefore, that when the government referred to "Young Brothers, Inc." in the indictment it meant "Young Brothers, Inc., Contractors". Moreover, appellant has not shown that it was prejudiced by the change in the indictment. The district court did not err by granting the government's motion to amend the indictment.

## ADMISSION OF COMPUTER–GENERATED RECORDS

Appellant also challenges the court's admission of certain computer-generated records which were kept in the regular course of the State's business.[12] Appellant contends that computer-generated records are less reliable than other kinds of business records because they depend upon the accuracy of the softwear as well as the person feeding the raw data into the computer. Apparently, appellant would have the government tender the software programmer to overcome this asserted "double hearsay" problem.

■■■ The admissibility of business records as an exception to the hearsay rule is governed by Rule 803(6) of the Federal Rules of Evidence. Under Rule 803(6), computer data compilations may be business records. They are admissible when the requirements for laying a proper foundation for their admissibility have been met. *United States v. Vela,* 673 F.2d 86, 90 (5th Cir.1982); *Rosenberg v. Collins,* 624 F.2d 659, 665 (5th Cir.1980); *United States v. Fendley,* 522 F.2d 181, 187 (5th Cir.1975).

12. Five of the computer-generated records were used to prove the conspiracy affected interstate commerce, and two were used to prove the actual amounts of the bids on the Gillespie County job.

"Any person in a position to attest to the authenticity of certain records is competent to lay the foundation for the admissibility of the records; he need not have been the preparer of the record, nor must he personally attest to the accuracy of the information contained in the records." *Rosenberg, supra,* 624 F.2d at 665. This rule applies to computer-generated business records as well as to other types of business records. *Ibid; United States v. Vela, supra,* 673 F.2d at 90; *United States v. Fendley, supra,* 522 F.2d at 187. It is undisputed that the records in question were maintained by the State in the course of its regularly conducted business activities. The documents were offered into evidence through the testimony of the state official responsible for their custody, who testified as to their authenticity. It is clear that a proper foundation was laid for the admission of the records.

"The trial court has broad discretion in ascertaining the admissibility of business records, and its ruling should be disturbed only when that discretion is abused." *Rosenberg, supra,* 624 F.2d at 665. The trial judge correctly admitted into evidence the computer-generated business records.

### REQUESTED JURY INSTRUCTIONS

 Finally, appellant contends that the district court erred in refusing to instruct the jury (1) that the reasonableness of a bid may be taken into account in considering whether the bid was the result of an unlawful agreement; (2) that the reasonableness of appellant's bid could be considered on the question of appellant's intent to defraud the State of Texas; and (3) that if the jury found the alleged activities to be wholly intrastate, then it also was required to find that the activities directly and substantially affected interstate commerce.

A court is not required, however, to charge the jury in the precise form and language requested by the parties. *See, e.g., United States v. Southers,* 583 F.2d 1302, 1308-09 (5th Cir.1978). "Once the judge has made an accurate and correct charge, the extent of its amplification must rest largely in his discretion." *United States v. Bayer,* 331 U.S. 532, 536, 67 S.Ct. 1394, 1396, 91 L.Ed. 1654 (1947). Moreover, a single jury instruction may not be judged in isolation but must be viewed in the context of the overall charge and the entire trial. *United States v. Park,* 421 U.S. 658, 674–675, 95 S.Ct. 1903, 1912–13, 44 L.Ed.2d 489 (1975); *Cupp v. Naughten,* 414 U.S. 141, 146–147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973).

Our review of the record indicates that the jury instructions given by the trial judge were adequate and did not require amplification. Moreover, appellant failed to object to the court's refusal to give the requested instruction on interstate commerce. We reject appellant's contention that the court's ruling on this instruction was plain error.

We find that the trial court may have committed one error which was harmless. Other assertions of error fail. Appellant was given a fair trial, and the convictions by the jury were proper.

AFFIRMED.