In re 666
ASSOCIATES/STREETERVILLE
UTILITY CO., INC.

In the Matter of 666 ASSOCIATES,
INC., Debtor, Streeterville Utility
Co., Inc., Debtor.

Bankruptcy Nos. 85 C 7884, 85 B 1684
and 85 B 1685.

United States District Court,
N.D. Illinois, E.D.

Sept. 8, 1986.

Norman B. Newman, Lord, Bissell & Brook, Chicago, Ill., for debtor.

John O. Collen, Chapman and Cutler, Chicago, Ill., for Fuller Commercial Brokerage Co.

Milton L. Fisher, Beverley J. Klein, Mayer, Brown & Platt, Chicago, Ill., for Homestead Savings.

Keevan D. Morgan, Joy K. Fallon, Charles R. Watkins, Chicago, Ill., for Treasure Island Foods, Inc.

Marilyn Klawiter, Erens, Hallock and Miller, Chicago, Ill., for Morse/Diesel.

Harry Adelman, Howard L. Adelman, Adelman & Gettleman, Ltd., Bruce L. Wald, Tishler & Wald, Ltd., Larry M. Wolfson, Jenner & Block, Chester H. Foster, Rochelle S. Dyme, David J. Gottesman (Rosenthal and Schanfield, of counsel), Chicago, Ill., for other creditors.

## MEMORANDUM OPINION AND ORDER

LEINENWEBER, District Judge.

This is an appeal from a final order of the Bankruptcy Court granting a secured

creditor's motion to lift an automatic stay that had previously been entered.

The appellant, 666 Associates ("Debtor"), filed a petition for reorganization under Chapter 11 of the Bankruptcy Code ("Code"), 11 U.S.C. 101, *et seq.* The principal asset of the Debtor's estate is a multiuse real estate development ("Project") located at 666 North Lakeshore Drive, Chicago, Illinois. Initially, the Debtor remained in possession pursuant to Sections 1107 and 1108 of the Code and was in possession at the time of the hearing before the bankruptcy judge.[1]

On December 7, 1984, Chemical Bank ("Chemical"), the principal secured creditor of the Debtor, filed a mortgage foreclosure suit against the Project in the Circuit Court of Cook County. This action was automatically stayed under Section 362(a) of the Code as a result of the filing of Debtor's petition.

On April 25, 1985, Chemical moved for relief from the automatic stay under Section 362(d) of the Code. After trial before the bankruptcy judge ("Trial"), an order was entered directing that the stay be lifted as to any party and interest seeking to enforce its lien rights in or against the Project. It is from this order that the Debtor appeals.

## A. FACTS

The facts are not complicated.[2] The Debtor was formed in 1979 to redevelop a large commercial building, located at 666 Lakeshore Drive, Chicago, that had been built in 1929 to house furniture showrooms (R6/20, pp. 138–140). The redevelopment converted this structure into condominiums, offices, retail use, garage use and basement storage (¶ 3). In the course of redevelopment Chemical made two separate loans totaling $90,000,000 (¶ 4). Both loans were originally secured by liens

against the entire Project (¶ 5). A portion of the Project, known as the West Tower, was sold off in 1983 (¶ 5). Chemical released its mortgages on that portion of the building in return for the cash down payment (R6/21, p. 111) and a security interest in a purchase money note ("West Tower note") given to the Project as part of the purchase price (¶ 3F). Payments under the West Tower note are funded only by cash flow from rentals of West Tower residences (666 Ex. 27).

On January 19, 1984, Homestead Savings ("Homestead") made a loan to the Project in the principal amount of $11,000,000 under a loan agreement that provided for extensions up to $25,000,000 (Homestead ex. 1). As security, Homestead received a first mortgage in the office, retail and commercial garage portions of the property to which Chemical subordinated its interests (Homestead ex. 3). As further security, Homestead received a lien against personal property relating to the real estate on which it held its first mortgage as well as a lien on certain assets of Streeterville Utility Co., Inc. ("Streeterville Utility"), a whollyowned subsidiary of the Debtor that purchased electricity in bulk for resale to the Project (Homestead exs. 7–11).

During the course of redevelopment, due to a depressed market condition for the sale of condominium residences, the Project fell on hard times (R6/20, pp. 142–143). As of the time of the trial only 58 condominium units out of 284 had been sold. Of the 430,764 square feet of office space, 71 percent was under lease, a significant amount at rates below the market. Of the total 65,223 square feet of retail space, 34,713 square feet was leased, of which approximately 25,000 square feet was leased to a supermarket and a drugstore. The garage portion consisted of 329 commercial spaces, and 165 condominium spaces of which 11

---

1. On July 24, 1985, pursuant to a motion of Homestead, a secured creditor, and the unsecured creditors' committee, a trustee was appointed, who is presently operating the Project.

2. Where the facts are taken from the record they are denoted by "R" followed by the date of

proceedings and the page(s), e.g., "R6/20, 1". Where the facts are taken from the Findings of Fact of the bankruptcy judge, they are denoted by "¶ __", which refer to the enumerated Findings of Fact of the bankruptcy judge.

had been sold. The basement storage area consisted of 37,000 square feet, of which 6,000 square feet was committed to the supermarket at no rental (¶ 3).

In August of 1984, the Debtor was declared to be in default on its obligation to Chemical and, as of August 29th, the principal indebtedness on the Chemical notes was $71,357,369.19, and on that date accumulated interest was $4,059,161.06 (¶ 6). On April 30, 1985, while the principal indebtedness remained the same, accrued interest had risen to $11,051,198.00 at the contract rate and $15,602,286.36 at the default rate (¶ 8).

Since the date of the original petition for reorganization no payments have been made by the Debtor to any secured party nor have any real estate taxes been paid (¶ 11). From the date of the petition through the time of trial, the Debtor had remained in possession pursuant to order of the bankruptcy court and had been permitted by court order to use cash collateral from operations of the Project to pay expenses of the Project (¶ 12).

Homestead had not consented to the use of its cash collateral (¶ 20) and since the filing of the petition the Debtor has used over a million dollars of cash collateral without offering or providing any protection to Homestead (¶ 21).

The bankruptcy judge also made the following additional findings to which the Debtor strenuously objects:

¶ 10. The aggregate amount of secured debt on the project is not less than $108,500,000 as reflected on the following chart of approximate amounts.

| Secured Party | Approx. amount of debt |
|---|---|
| Chemical Bank | $ 82,400,000.00 |
| Homestead Savings | $ 11,000,000.00 |
| Westport Company | $ 7,500,000.00 |
| Real estate taxes | $ 5,600,000.00 |
| Asserted Mechanics' Lien Claims | $ 2,000,000.00 |
| TOTAL SECURED DEBIT | $108,500,000.00 |

¶ 13. The cash that has been generated from operations of the project has been insufficient to pay operating expenses of the project, and has also been insuffi-

cient to pay real estate taxes and debt service. During the time the Debtor has operated as a Debtor in possession, operations have been conducted at a cash deficit, and the cumulative deficit has increased each month. For the three-month period from February through April 1985, the Debtor had operating expenses of approximately $440,000.00, but cash receipts of only $375,000.00. Real estate taxes during this period accrued at the rate of approximately $250,000.00 per month. Taking into account unpaid operating expenses, real estate taxes and debt service accrual, the cumulative deficit for that three-month period was in excess of $3,000,000.00. This represented a continuation of the trends experienced in prior years, when the project was also operated at a loss.

¶ 16. The present fair market value of the project is not greater than $93,525,000.00 which was testified to by the Debtor's expert appraiser, Eugene W. Stunard. That appraised value was specifically conditioned upon the "availability of adequate funds for necessary construction of building and tenant improvements, payments of leasing commissions and other costs commensurate with the leasing of the residential office and retail space." Adequate funds have not heretofore been available.

¶ 17. The value of the property is less than the amount of debt for which the property is security. Thus, the Debtor lacks equity in the property.

¶ 18. The Debtor has not proposed any plan of reorganization. Although the Debtor's principle, David Paul, testified to having considered four different general categories for possible reorganization which may be generally categorized as (1) liquidation, (2) recapitalization, (3) refinancing, and (4) continuation of present operations until the income from the property or the market conditions which determine its value will improve, his recitation failed to suggest any detail. No means for the accomplishment of any of the essentially generic forms of reor-

ganization was suggested by Mr. Paul's testimony, nor by any other evidence presented.

## B. THE LAW

Based on his Findings of Fact, the bankruptcy judge made conclusions of law [3] that Chemical and Homestead had valid and perfected first mortgage liens against portions of the property (L¶¶ 2, 3); that rents and other income generated by the Project constituted cash collateral as the term is defined in Section 363 of the Bankruptcy Code (L¶¶ 4, 5); that Chemical was entitled to adequate protection of its interest in the Project and the West Tower note (L¶ 6); that the Debtor had failed to offer or provide any protection for the property interests of Chemical and the Project other than the value of the Project and that Chemical's interest in the Project was not adequately protected (L¶ 7); that there was no reasonable prospect that the Debtor would be able to provide adequate protection to Chemical because the cash generated by operations of the Project was insufficient to compensate Chemical for the decrease in value of its interest in the Project (L¶ 8); that Debtor had no unemcumbered property upon which could be granted a replacement lien and that the Debtor could not tender anything of value that would provide its secured creditors with the "indubitable equivalent" of their property interests in the Project (L¶ 8); that the Debtor had no equity in the Project (L¶ 9); and that the Debtor had failed its burden under Section 362(g) of the Code to show that the property was necessary to an effective reorganization (L¶ 10) and that it, in fact, was not necessary to an effective reorganization as there had been no demonstration of any form or manner of plan by which the Debtor might reasonably be expected to effectively reorganize (L¶ 11). The bankruptcy judge also found that the Debtor had failed to carry its burden of proof with respect to certain affirmative defenses that it had presented but that it was not necessary to determine any such issue in connection with relief from the stay (L¶ 14). Accordingly, the bankruptcy judge lifted the stay to allow enforcement of any and all liens against the Project.

Section 362(d) of the Code authorizes the bankruptcy court to lift the stay for cause, including the lack of adequate protection of a secured interest in the property or, with respect to a stay of an act against property, when the Debtor does not have an equity in the property and the property is not necessary to an effective reorganization.[4] Section 362(g) places the burden of proof of Debtor's equity in the property on the party requesting that the stay be lifted. The burden of proof on all other issues is placed upon the Debtor.[5] The bankruptcy judge based the lifting of the stay on his findings that cause existed and the Debtor had no equity in the property and that the property was not necessary to an effective reorganization.

---

3. Conclusions of law of the bankruptcy judge are denoted by "L¶ ___", which refer to the enumerated findings of law of the bankruptcy judge.

4. Section 362(d) of the Code authorizes a bankruptcy court to lift a stay. It reads as follows:
 On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
 (1) for cause, including the lack of adequate protection of an interest in property under subsection (a) of this section of such party in interest; or
 (2) with respect to a stay of an act against property, if—

 (A) the debtor does not have an equity in such property; and
 (B) such property is not necessary to an effective reorganization.

5. Section 362(g) of the Code places the burden of proof on the issue of the debtor's equity in the property on the party requesting that the stay be lifted: It provides as follows:
 In any hearing under subsection (d) or (e) of this section concerning relief from the stay of any act under subsection (a) of this section—
 (1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and
 (2) the party opposing such relief has the burden of proof on all other issues.

## C. DISCUSSION

### I. ADEQUATE PROTECTION

Section 362(d) authorizes "a party in interest" to request relief from the automatic stay "for cause including lack of adequate protection of an interest in property." Section 361 illustrates several means of providing adequate protection although the methods illustrated are not exclusive.[6] See, generally, *Collier in Bankruptcy*, ¶ 361.01 (L. King, 15th ed. 1983). Neither section defines "adequate protection" or prescribes what precisely is to be protected. Consequently, a difference of opinion has arisen as to whether the "interest" in the security or the security itself is the focus of protection. See, e.g., *In re: American Mariner Industries, Inc.*, 734 F.2d 426 (9th Cir. 1983); but see, *2 Collier on Bankruptcy*, ¶ 361.01(4) (15th ed. 1985). However, Section 361 provides two specific examples of the provision of "adequate protection" and a third "catch-all" provision. Under the first specific example of adequate security the trustee must make periodic cash payments to the secured party to prevent a decrease in the value of the secured party's interest in the property. Under the second specific example the secured party must be provided with an additional replacement lien to the extent that the stay results in a decrease in the value of the secured party's interest in the collateral. The so-called "catch-all" provides for the "granting [of] such other relief ... as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property." It appears to the court that any reasonable reading of the Section 361 specific examples leave little room to interpret Section 362(d) in any way other than requiring protection of the secured party's interest in the collateral.

Where multiple security interests exist, where the debt is not being serviced, and where the Debtor's equity is questionable (such as is presented here), the passage of time obviously reduces the percentage of the creditors' receivable protected by the security. Where one creditor is junior to another (also such as is presented here), the percentage of the junior creditor's receivable covered by the security will fall compared to that of the senior secured creditor.[7]

Congress' use of the words "indubitable equivalence" in Section 361 bolsters the interpretation that Section 362(d)(1) protects the interest of the secured creditors rather than just the security itself, in spite of *In re: Alyucan*, 12 B.R. 803, 809 (Dist. Utah 1981). The words come from *In re: Murel Holding Corp.*, 75 F.2d 941 (2nd Cir.1935) where they were used in the context of protecting a secured creditor's interest in a security.

The Debtor argues that "adequate protection" is a question of law for *de novo* determination by the court, citing no less than the bankruptcy judge himself who treated it as a conclusion of law (L¶ 7). Although the difference between a question of fact and a question of law can often be one of sematics, the bankruptcy judge did make the following Findings of Fact which support a *de novo* finding of law

---

6. When adequate protection is required under Section 362, 363 or 364 of this title of an interest of an entity in property, such adequate protection may be provided by:

(1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under Section 362 of this title, use, sale, or lease under Section 363 of this title, or any grant of a lien under Section 364 of this title results in a decrease in the value of such entity's interest in such property;

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in

the value of such entity's interest in such property; or

(3) granting such other relief, other than entitling such entity to compensation allowable under Section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

7. Here, Homestead is senior to Chemical; the real estate tax liens are senior to both Homestead and Chemical; and under certain circumstances some or all of the mechanics' liens might be senior to Homestead and Chemical (see Ill.Rev.Stat., ch. 82, ¶ 16).

that the Debtor failed to meet its burden of proof of adequate protection.

The Debtor was in default in its obligation to Chemical as early as August of 1984 and on August 29th accumulated interest was $4,059,161.06, which interest had accumulated to $11,051,198 as of May 28, 1985 (¶¶ 6, 8).

Homestead is a secured creditor to which Chemical's mortage lien is subordinate and has not received any payment since the filing of the petition for reorganization on principal or interest (¶¶ 5, 9, 11).

Operations of the Project has generated insufficient cash to pay operating expenses, real estate taxes or debt service (¶ 13).

The value of the property is less than the amount of debt to which the property is secured (¶ 17).

The court does not find any of these Findings of Fact "clearly erroneous".

Failure to service Chemical's debt has caused its interest, which is protected by the collateral, to grow by the amount of unpaid interest and principal. Failure to service Homestead's debt, which is senior to that of Chemical, has caused Chemical's interest in the collateral to shrink. Failure to pay real estate taxes, which is a prior lien to both Chemical and Homestead, causes Chemical's and Homestead's interests in the collateral to shrink. Allowing mechanic's liens to attach to the Project to the extent that they are superior to Chemical or Homestead also causes their interests in the collateral to shrink.

 Therefore, this court concludes *de novo* that the Debtor has not met its burden of proving adequate protection of the interests of Chemical in the security.

## II. WHETHER THE DEBTOR LACKED EQUITY IN THE PROJECT AND WHETHER AN EFFECTIVE REORGANIZATION IS POSSIBLE

The bankruptcy judge made a finding that the present fair market value of the property was less than the amount of debt for which the property is being held as security and, therefore, the Debtor lacked equity in the property (¶ 17). The Debtor correctly places the burden of proof on this issue on the person seeking relief from the stay. The Debtor argues that the bankruptcy judge's Finding of Fact that the fair market value of the Project was only $93,525,000 clearly erroneous because it was based on the Debtor's appraisal of the fair market value of the Project on January 1, 1985 and the Project had substantially increased in value by July 1, 1985 when the judge made his decision.

There are a number of problems in accepting the Debtor's argument on this point, not the least of which is that it misrepresents the Finding of Fact. The bankruptcy judge made findings that the value of the property was less than the amount of the debt and that the Debtor lacked equity in the property (¶ 17). He did not make a finding that the present fair market value of the Project was $93,525,000. He did find that the present fair market value of the Project "was not greater than $93,525,000" and that the secured indebtedness was $108,500,000 (¶¶ 16, 10). The bankruptcy judge clearly did not feel that a specific determination of fair market value of the Project was necessary because the top of the range of testimony was substantially less than the secured indebtedness.[8]

---

8. The bottom of the range of testimony was $63,415,000 as testified to by Jules Marling, appraiser for Chemical. Since the $93,525,000 figure was testified to by the debtor's appraiser, Eugene W. Stunard, it can reasonably be assumed that the value of the parcel is somewhere in between, but not more than $93,525,000 nor less than $63,415,000. This is more apparent when one notes, as did the bankruptcy judge, that the debtor's appraiser specifically conditioned his figure of $93,525,000 upon the "availability of adequate funds for necessary construction of building and tenant improvements, payments of leasing commissions and other costs commensurate with the leasing of the residential office and retail space." In the event these funds were insufficient, according to the testimony of Mr. Stunard, the value of the project would drop (R6/20–45).

■ The Debtor's assertion that the property had greatly increased in value between January 1st and July 11, 1985 is without a shred of opinion testimony to support it. Specifically, Debtor's expert, Eugene W. Stunard, testified that he had no opinion as to the market value of the property as of the day he testified (June 20, 1985) and that he had no opinion of whether there had been any change in the market value of the property between January 1, 1985, the date of his appraisal, and the date of his testimony (R6/20,43). On the other hand, Mr. Marling, appraiser for Chemical, testified that he commenced his appraisal in February and finished it in early May of 1985 and that in his opinion the Project had maintained the same value during this period (R6/19,45–46). Each appraiser testified in detail about his method of appraisal, which markedly differed in some respects. Each appraiser had prepared a written appraisal which was admitted into evidence (Chemical ex. 30, 666 exs. 4A, 4B). Therefore, based on the appraisal testimony this court concludes the Findings of Fact that the amount of secured debt exceeds the value of the collateral property, and that the Debtor had no equity in the property, are not clearly erroneous.

The bankruptcy judge also reached the legal conclusion that the Debtor failed to meet its burden of proving that the property is necessary to an effective reorganization (L¶ 10). The judge reached his conclusion because the Debtor failed to demonstrate in any form or manner a plan by which it might reasonably be expected to reorganize effectively. The Findings of Fact in support of this conclusion are as follows: although the Debtor's principle, David Paul, testified to four different general categories for possible reorganization: 1) liquidation, 2) recapitalization, 3) refinancing, and 4) continuation of present operations until income from the property or market conditions improve, he failed to suggest any detail and no means for the accomplishment of any of the essentially generic forms of reorganization (¶ 18); the Debtor had not offered any plan for protecting the interest of any secured creditor

(¶ 19); since the petition was filed the Debtor had used over $1,000,000 of cash collateral (¶ 21); the cash generated from operation of the Project was insufficient to pay operating expenses, real estate taxes and debt service; during the entire time the Debtor had operated as a Debtor in possession, operations were conducted at a cash deficit; and the most recent three month period (February through April, 1985) demonstrated an accumulative deficit of in excess of $3,000,000 for operating expenses, real estate taxes and debt service accrual (¶ 13).

The Debtor argues in response that it is not necessary to flesh out the reorganization plan at a hearing to lift the stay; that certain semi-monthly interim statements indicated that Debtor was meeting its operating expenses at the time of the hearing; and that cash flow in April and May, 1985 had reached an operating position, thus making the Project a "viable going concern."

On the other hand, Chemical presented the testimony of an expert accountant, William Ellis of Ernst & Whinney, who analyzed in detail whether the Debtor could meet its operating expenses, real estate tax liabilities and its debt service. Based on a review of the Debtor's books and records, he concluded that the Debtor could not even pay minimal operating expenses, excluding reserves for unanticipated maintenance, real estate taxes, or debt service (R5/29, 116–124). He concluded that the amount of expense in excess of cash available was over $1,000,000 per month and that the accumulated cash deficit for the quarter February through April, 1985 was $3,000,000 (R5/29, 133–134).

This court cannot say based on this evidence that the findings of the bankruptcy judge were clearly erroneous.

■ The Debtor argues, not unreasonably, that no reorganization could be accomplished without the Project inasmuch as the Project is basically the only asset of the Debtor. While this may be true it begs the question of whether it can effectively

be reorganized. The question of "effective reorganization", similar to "adequate protection", is a mixed question of law and fact. However, the Findings of Fact upon which the bankruptcy judge concluded that there could be no effective reorganization are not clearly erroneous. While Mr. Stunard, appraiser for Debtor, testified, that although condo sales were currently in a "trough", they "will be in a peak sometime in the future" (R/19–212), Mr. Marling, appraiser for Chemical, testified that the condo market was not good in Chicago and in his opinion the appropriate thing for the Project was to lower the price of the condos and to sell off as quickly as possible (R/5–187, 188). It was partially for this reason that he appraised the Project at only $63,415,000. Inasmuch as the current indebtedness of the Project is over $108,-000,000,[9] the court cannot say that the bankruptcy judge's Findings of Fact upon which the conclusion of law was based were clearly erroneous. Based on these facts, the court finds *de novo* that the Project is not necessary to an effective reorganization.

### III. WHETHER DEBTOR RECEIVED A FULL AND FAIR HEARING

The Debtor also contends that it was not afforded a full and fair hearing because it was not permitted to depose a senior executive of Chemical, a Mr. Walter Shipley ("Shipley"). The record shows that Shipley was Chairman of Chemical Bank. The suggestion is that Shipley at one time inquired about the status of the Debtor's loan from the head of Chemical's real estate division, which resulted in a memorandum being sent to Shipley. There is no indication that Shipley had any knowledge of any of the issues presented in the hearing to lift the stay. In fact, the Debtor indicates that he may have had some knowledge "potentially relevant to Associate's affirmative defense of equitable subordination." However, it is

**9.** Debtor objected to the finding of total secured debt to be $108,500,000. The basis of the objection was the method by which Chemical proved its own secured debt. Chemical called the Section head of its loan accounting department

unnecessary to determine any of the issues raised by the affirmative defenses in connection with *this* proceeding to life the stay as they can be adequately raised in the foreclosure proceedings. The court finds that the Debtor received a full and fair hearing before the bankruptcy judge.

### D. CONCLUSION

Accordingly, the order of the bankruptcy judge, dated July 11, 1985, lifting the automatic stay as to any party and interest seeking to enforce its security or lien rights in the Project is hereby affirmed.

IT IS SO ORDERED.

who testified to the authenticity of its business records. This is all that is necessary. All other matters go to the weight. *United States v. Young Bros., Inc.,* 728 F.2d 682 (5th Cir.1984).