**UNITED STATES of America**

v.

**Fermando Arthur JOHNSON, Defendant.**

**No. P–97–CR–213–F.**

United States District Court,
W.D. Texas,
Pecos Division.

Aug. 18, 1998.

721

Fred C. Brigman, Assistant U.S. Attorney, Midland, TX, for the Government.

Robert J. Perez, El Paso, TX, Kevin Milner, Palatine, IL, for Defendant.

## MEMORANDUM ORDER AND OPINION

FURGESON, District Judge.

Before trial, Fermando Arthur Johnson moved the Court to permit him to admit into evidence, under Federal Rule of Evidence 804(b)(3), two self-incriminating statements against interest made by Dimetrius Ann Kimble, which were exculpatory to Defendant. After evaluating the written statement of Kimble dated May 5, 1998 and the written transcript of her statement given May 27, 1998, and considering arguments of both parties' counsel offered at an evidentiary hearing conducted on June 29, 1998, the Court ruled at the conclusion of the hearing that the statements were not trustworthy and were therefore inadmissible. Thereafter, Defendant conditionally pled guilty to possession of cocaine with intent to distribute, a violation of 21 U.S.C. § 841(a)(1), but reserved his right to appeal the Court's ruling. The purpose of this Memorandum Order and Opinion is to set forth in detail the reasons for this Court's decision.

### FACTUAL BACKGROUND

On November 23, 1997, Defendant Johnson approached the Sierra Blanca checkpoint[1] in a blue Chevrolet Cavalier, which he had rent-

1. The Sierra Blanca checkpoint is located in southwest Texas on Interstate Highway I–10, approximately 12 miles from the United States/Mexico border.

ed from Enterprise Rental in West Memphis, Arkansas. Border Patrol agents questioned him in the primary inspection area about his citizenship. Because Defendant avoided eye contact, appeared nervous and answered questions in a broken and hesitant voice, the Border Patrol agent on duty referred him to the secondary inspection area. The Border Patrol agent requested permission to search his vehicle using a canine, and Defendant consented. When the canine handler walked the dog around Defendant's vehicle, allowing him to sniff it, the dog alerted at the left rear wheel well of the vehicle, then jumped inside the vehicle and alerted to the side panel of the back left door and the bottom of the back seat. Based on the dog's reaction, the agent searched Defendant's vehicle and discovered several packages of cocaine. Approximately one half-hour later, the dog was allowed to re-sniff all parts of the vehicle, and found additional packages of cocaine on the passenger side. The total amount of cocaine discovered in Defendant's vehicle was nine (9) packages,[2] weighing approximately 22.28 pounds (approximate street value: $200,000 to $250,000). Defendant was then arrested, read his rights and placed in custody.

Dimetrius Ann Kimble, who had known Defendant Johnson for three years, was engaged to Defendant's cousin Willie McGee before he died. On May 27, 1998, Kimble was questioned by Clyde Dortch of Brewer Detective Service of Memphis, Tennessee. Elizabeth T. Bush of Riverside Reporting Service in Memphis provided a notarized, written transcript of the interview, which is purported to be Kimble's sworn statement, and is attached to and incorporated into this Memorandum Order and Opinion. In the statement, Kimble claimed that, prior to the time that Defendant rented the blue Cavalier, her friend Kim Washington rented the same blue Cavalier from Enterprise Rental in West Memphis for Kimble's use because Kimble's van had broken down. Although Kimble is not related to Washington, Kimble claimed that they "kind of got along with each other." Kimble asserted that Washington rented the van for her because Kimble did not have a credit card. Kimble claimed that she lied to her friend about where she was going with the car. Kimble stated that she drove around West Memphis in the rental car, keeping the car "more than a day because ... [Washington] needed to turn [the car] back in." Kimble claimed she rented the car as a safe place to keep drugs, specifically to store 22 pounds of powder cocaine, because "she wasn't going to keep" the cocaine in her house. Kimble said she owned and planned to sell the nine bundles of cocaine, which she packaged in Saran Wrap and then wrapped in duct tape. Kimble stated that her fiancé Willie Ralph McGee, Defendant's cousin, actually hid the drugs in the blue Cavalier's rear paneling, with her assistance. When Washington picked up the rental car from Kimble to return it to the rental car agency, Kimble claimed she did not remove the cocaine from the car because she did not want Washington to know it was there. Kimble claimed that she figured she could get Washington to return to Enterprise and rent the same car again for her. She added that she didn't try to remove the cocaine from the car after Washington returned it to the rental car agency because she did not want the rental agency to know that she had stashed drugs in the car. Kimble claimed that she made repeated attempts to rent the same car from Enterprise but each time she checked, it was rented out.

At the hearing, a handwritten letter dated May 5, 1998 and notarized by Paul A. Mosley of Crittenden County, Arkansas the same day was produced by Defendant, which was purportedly written by Dimetrius Ann Kimble to Kim Washington. The referenced letter is also attached to and incorporated into this Memorandum Order and Opinion In the letter, Kimble stated that rather than use the blue Cavalier to spend some time with her kids at the park, she instead stored nine

---

**2.** There appears to be some slight confusion created by the wording of the Court's Order Denying Defendant's Motion to Suppress, where the nine packages of cocaine recovered were inadvertently referred to as "nine bottles" in one instance. (Order Denying Def.'s Mot. to Suppress at 3). The correct reference should have been to nine *packages* of cocaine, as that was the correct number and description of items removed from the rental car Defendant was driving.

bundles of drugs in the rear paneling on both sides of the vehicle. She then stated that Washington came and got the car so quickly that she did not have a chance to retrieve the drugs. She further claimed that she kept going back to the rental car agency but the car was always gone. Finally, she stated in the letter that she stopped looking for the drugs because the man to whom she owed a lot of money had been killed. Attached to the letter is a receipt from Enterprise Rental indicating that Washington had in fact rented a Cavalier from Enterprise Rental on September 4–9, 1998.

Defendant seeks to use Kimble's letter and the transcript of her interview in his defense to establish that, unbeknownst to him, the cocaine was stored in the blue Cavalier when he rented it from Enterprise, having previously been placed there by Kimble and her late fiancé. Kimble has now expressed her intention that, if called to testify, she will assert her Fifth Amendment privilege against self-incrimination.

### DISCUSSION

█ This case presents the issue of whether Dimetrius Ann Kimble's statements exculpatory to Defendant are admissible as a statement against penal interest qualifying as an exception to the hearsay rule under Federal Rule of Evidence 804(b)(3).[3] To be admissible under Rule 804(b)(3), a statement must meet three tests: the declarant's testimony must be unavailable; the statement must so far tend to subject the declarant to criminal liability "that a reasonable man in his position would not have made the statement unless he believed it to be true;" and the statement, if offered to exculpate the accused, must be corroborated by circumstances clearly indicating its trustworthiness.

United States v. Thomas, 571 F.2d 285, 288 (5th Cir.1978). See also United States v. Briscoe, 742 F.2d 842, 846 (5th Cir.1984) (identifying three requirements for use of hearsay exception of Rule 804:(1) declarant must be unavailable; (2) statement must be against declarant's penal interest; and (3) corroborating circumstances must indicate trustworthiness of statement); United States v. Sanchez–Sotelo, 8 F.3d 202 (5th Cir.1993) (finding exculpatory inmate witnesses failed to qualify for exception because two of three Briscoe factors were absent).

### Unavailability of Witness Dimetrius Ann Kimble to Testify

█ Rule 804(a) defines "unavailability" to include situations in which the declarant is exempted from testifying because of privilege.[4] Dimetrius Ann Kimble's testimony was unavailable under Rule 804(a) because she expressed her intention to assert her privilege against self-incrimination under the Fifth Amendment. Her unavailability based on the Fifth Amendment privilege satisfies Rule 804(a)(1). Thomas, 571 F.2d at 288, citing United States v. Mackin, 561 F.2d 958 (D.C.Cir.), cert. denied, 434 U.S. 959, 98 S.Ct. 490, 54 L.Ed.2d 319 (1977). In order for the court to consider a witness unavailable on the basis of privilege, she must actually claim the privilege and the judge must rule that her assertion of the privilege constitutes unavailability. United States v. Oropeza, 564 F.2d 316, 325 n. 8 (9th Cir.1977) ("[E]xpress claim of privilege and a ruling thereon should be made."), cited with approval in Thomas, 571 F.2d at 288 ("Rule 804(a)(1) requires an express assertion of the privilege and a ruling by the court that the privilege constitutes unavailability."). See also Advisory Commit-

---

**3.** Rule 804(b)(3) provides that a statement against interest is not excluded by the hearsay rule if the declarant is unavailable as a witness. A "statement against interest" is defined by the Rule as follows:

A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to

expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement. FED R. EVID. 804(b)(3) (Supp.1998).

**4.** Rule 804(a)(1) provides that "[u]navailability as a witness" includes situations in which the declarant—(1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement[.] FED. R. EVID. 804(a)(1) (Supp.1998).

tee's Note to Rule 804(a)(1), reprinted in 28 U.S.C. Fed. R. Evid. following Rule 804, at 446 ("Substantial authority supports the position that exercise of a claim of privilege by the declarant satisfies the requirement of unavailability .... A ruling by the judge is required, which clearly implies that an actual claim of privilege must be made.").

The Court, recognizing that the statements by Kimble that Defendant proffered are self-incriminating, ordered that counsel be appointed to represent her interests. While Kimble did not personally assert the privilege on the record, she was present at the hearing and her counsel expressly confirmed that she intended to assert the privilege against self-incrimination if called to testify. Thus, the existence of the privilege, Kimble's right to assert it, and her unavailability as a witness were patently obvious to the Court. *See Thomas,* 571 F.2d at 288; *United States v. Young Bros., Inc.,* 728 F.2d 682 (5th Cir. 1984), *cert. denied,* 469 U.S. 881, 105 S.Ct. 246, 83 L.Ed.2d 184 (1984) (noting that requirement that court rule upon validity of witness' assertion of privilege need not be met when its fulfillment would be mere formalism). The Court therefore considers her to be "unavailable" for purposes of the Rule.

### Statements Against Witness' Penal Interest

■ The statements offered by Kimble satisfy the requirement that they be against her penal interest. Advisory Committee's Note to Rule 804(b)(3) states that whether the statement is in fact against interest must be determined from the circumstances of each case. Advisory Committee's Note to Rule 804(b)(3) at 449. In her remarks, Kimble attempted to confess to owning, possessing and intending to distribute the approximately 22 pounds of cocaine seized from the blue Cavalier rental car, and to establish that Defendant was not culpable, thereby absolving him of all criminal liability. For a statement to qualify as a 804(b)(3) statement against interest, the statement must tend to subject the declarant to criminal liability so that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true. Fed. R. Evid. 804(b)(3) (Supp.1998). By re-

ferring to statements that "tend" to subject the declarant to criminal liability, the Rule encompasses disserving statements by a declarant that would have probative value in a trial against the declarant. *Thomas,* 571 F.2d at 288. *See also* Advisory Committee's Note to Rule 804(b)(3) at 448 (noting that exposure to criminal liability satisfies the against-interest requirement); *United States v. Garris,* 616 F.2d 626, 630 (2d Cir.), *cert denied,* 447 U.S. 926, 100 S.Ct. 3021, 65 L.Ed.2d 1119 (1980) (determining that a statement satisfies the against-interest requirement if it would be probative in trial against the defendant). A reasonable person would have realized that the remarks made by Kimble established her personal participation in the crime and hence would tend to subject her to criminal liability. If she were on trial for this crime, her admissions coupled with physical and circumstantial evidence might be sufficient to convict her of the offense for which Defendant has been indicted. Kimble's statement would not have been made by "a reasonable [person] in her position ... unless [s]he believed them to be true." The Court therefore finds that the statements Kimble made on the two referenced occasions were against her penal interest.

### Trustworthiness of Witness' Statements

Kimble's statements, having survived threshold inquiry regarding penal interest, must now prove trustworthy, in order to be admitted into evidence. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement. Fed. R. Evid. 804(b)(3) (Supp.1998). *See United States v. Salvador,* 820 F.2d 558, 561 (2d Cir.1987), *cert. denied,* 484 U.S. 966, 108 S.Ct. 458, 98 L.Ed.2d 398 (1987) (noting that statements exposing the declarant to criminal liability but exculpating the accused are suspect; thus, the inference of trustworthiness from the proffered corroborating circumstances must be strong, not merely allowable).

■ The Advisory Committee on the Proposed Rules admonishes that the require-

ment of corroboration be "construed in such a manner as to effectuate its purpose of circumventing fabrication." *United States v. Bagley*, 537 F.2d 162, 167 (5th Cir.1976), *cert. denied*, 429 U.S. 1075, 97 S.Ct. 816, 50 L.Ed.2d 794 (1977), quoting Advisory Committee's Note to Rule 804(b)(3) at 448.[5] The accused has the burden to justify admission of the exculpatory statement by showing corroborating circumstances that indicate the trustworthiness of the statements. *Salvador*, 820 F.2d at 561. The Court considers the burden to be by a preponderance of the evidence. Here Defendant has failed to sustain his burden of proof, however. The only fact that is even slightly corroborative of Kimble's story is that Washington and Johnson each rented a Cavalier from the same car rental agency on different dates. The remaining information regarding Defendant Johnson's stop, search, arrest, and the cocaine seized was information that was easily communicated between Johnson and his friends such as Kimble. A much greater showing is required to establish that strong corroboration exists.

■ In examining the circumstances in which Kimble's statements were given and their content, the element of trustworthiness likewise fails. Under Rule 804(b)(3), the term trustworthiness is analyzed by two distinct elements. *Bagley*, 537 F.2d at 167. In order for a declaration against penal interest to be trustworthy evidence, the statement must actually have been made by the declarant, and it must afford a basis for believing the truth of the matter asserted. *Id.* at 166–67. Both of the referenced statements were made by declarant Kimble; she volunteered both statements after an opportunity for reflective thought under circumstances she herself carefully engineered. Kimble had her May 5, 1998 letter notarized and she gave her May 27, 1998 statement to a private investigator without any opportunity for cross-examination by the Government. As if the circumstances under which she gave her statements were not suspect enough, the content of such statements is yet more implausible. Kimble's statements afford no basis for belief, as they are replete with inconsistencies, many of which are identified below:

1. Washington, a casual acquaintance who "kind of got along" with Kimble, was willing to use her credit card to rent a car on Kimble's behalf, ostensibly so Kimble could take her kids to the park.

2. Kimble perceived that a short-term rental car, rented by a casual acquaintance who might ask for it back at any moment, was a safer place to keep bundles of cocaine than was her house.

3. Kimble and her late fiancé went through the effort to remove the rental car's rear paneling so that drugs could be concealed during her one-day use of the car.

4. Kimble did not bother to check when she might have to surrender the car to Washington, so she was caught by surprise when Washington requested the return of the car. She made no effort to convince Washington to allow her to keep the car a little longer so that she could remove the drugs from the car. Instead, she left drugs valued at over $200,000 in the rental car, knowing Washington would return it to the rental car agency, purportedly on the assumption that she could persuade Washington to rent the same car for her again.

5. After Washington returned the car to the rental car agency, Kimble made no effort to retrieve the drugs on that occasion, because she did not want the agency to know that she had stashed drugs in the

---

**5.** Advisory Committee's Note to Rule 804(b)(3) states:

... one senses in the decisions a distrust of evidence of confessions by third persons offered to exculpate the accused arising from suspicions of fabrication either of the fact of the making of the confession or in its contents, enhanced in either instance by the required unavailability of the declarant. Nevertheless, an increasing amount of decisional law recognizes exposure to punishment for crime as a sufficient stake (citations omitted). The requirement of corroboration is included in the rule in order to effect an accommodation between those competing considerations. The requirement of corroboration is preliminary to admissibility, and should be construed in such a manner as to effectuate its purpose of circumventing fabrication.
Advisory Committee's Note to Rule 804(b)(3) at 448.

car. Yet she later contacted the rental car agency on numerous occasions, attempting to rent that specific car, never considering the possibility that agency personnel might begin to wonder why she was fixated on that particular vehicle.

6. Kimble contacted the rental car agency many times to rent the same car, yet she had no credit card, which she knew was required in order to rent a car.

7. The rental car agency coincidentally happened to rent the same car, which had proven so elusive during Kimble's repeated attempts to rent it, to the cousin of her late fiancé, a person whom she had known for three years, and who was apparently known to Washington as well, judging from the reference to him in Kimble's May 5, 1998 letter.

8. Neither the rental car agency, which cleaned the car after Washington's rental, nor Defendant Johnson, who later rented the car, noticed that the car's rear panels had been tampered with or that it contained any evidence of the presence of drugs.

9. Kimble abandoned her efforts to retrieve drugs valued at over $200,000 because the man to whom she owed money had been killed. Consequently, she decided there was no further reason to retrieve the drugs.

All these circumstances irreparably erode the credibility of declarant Dimetrius Ann Kimble. The Court is thus of the opinion that the statements Kimble made on the two referenced occasions do not fall within the ambit of the exception provided in Rule 804(b)(3). Based on the contents of witness Dimetrius Ann Kimble's statements and the circumstances under which they were made, the Court finds them completely unworthy of belief.

## CONCLUSION

In order for either Dimetrius Ann Kimble's statement recorded on May 27, 1998 or her handwritten letter dated May 5, 1998 to be admissible as a statement against interest pursuant to Rule 804(b)(3), testimony must show that the statement made by Kimble, who is now unavailable pursuant to Rule 804(a)(1), was against her penal interest, and that corroborating circumstances indicate the trustworthiness of the statement. The Court is of the opinion that, while the statements made were against her penal interest, such statements were untrustworthy. Therefore, neither statement is admissible.

Accordingly, it is **ORDERED** that Defendant's motion to admit into evidence Dimetrius Ann Kimble's handwritten letter dated May 5, 1998 and the written transcript of her statement recorded on May 27, 1998 as statements against interest be **DENIED.**

ATTACHMENT

May 5, 1998

Anto

What's up? I'm just writing to say a few words to you. I hope you can find a way to forgive me.

Remember when you were at Sis' (Fernando's aunt) house, I overheard you tell his mama that Enterprise car rental expected you to pay for the car Fernando rented. You were saying the Police had tore it apart and found drugs in it.

I started thinking and putting shit together. Fernando in jail, for drugs I had heard it was Federal. If what I'm going to tell you has anything to with his situation then you may want to get in touch with the prosecutor or his lawyer.

Remember when in September you rented that Blue Cavalier and let me borrow it? I know I told you I wanted to spend some time with my kids at the park or 8) laty land, That's not what I did, I hope you & Fernando can forgive me for this but I had drugs in that car. I had a total of 10 bundles but

real paneling, on both side

You came and got the car so quick that I didn't get a chance to get them back. I honestly tried to find the car. I kept going to Enterprice but the car was always gone. I stopped looking for the drugs because the guy I owed a lot of money to died (killed) in October.

Is there something I can do or say to let the police or whoever will instead me know I'm the one whose drugs were found.

Again, I'm really, really sorry for all this mess in yous & Fernando's life. Please contact me to let me know how I can left this off my spirits too.

ENTERPRISE RENT-A-CAR COMPANY OF TENNESSEE
3554 SOUTH MENDENHALL      901-775-7042
MEMPHIS        TN 38115      CA10
RENTAL TYPE  C             POLICE  H71370 - 999

24-HOUR DAY

RENTAL AGREEMENT
D090722
PAGE 1 OF 1

RENTER
KIMBERLY WASHINGTON
175 KILLARNEY

SUMMARY OF CHARGES

MILES

I truly believe they'll listen to me. I'm willing to exept my punishment because I can't take my guilty feeling any more.

Notary _____ mosley _____

County _____

State _____

Ex _____ -2003

Date _____ 9/98

SWORN STATEMENT

DIMETRIUS ANN KIMBLE

MAY 27, 1998

2555 Poplar Avenue, Memphis, TN
BETH T. BUSH, RPR

Riverside Reporting Service

22 N. Second Ave.

Suite 303

Memphis, TN 38103
*APPEARANCES*

Clyde Dortch

Brewer Detective Service

2555 Poplar Avenue

Memphis, TN 38112
*DIMETRIUS ANN KIMBLE,*

(After having been duly sworn, was questioned and answered as follows:)

*EXAMINATION*

BY MR. DORTCH:

Q This is a general statement taken at 2555 Poplar Avenue. My name is Clyde Dortch. I'm a private investigator. Present in the room is Mrs. Beth Bush, reporter, and also Ms. Dimetrius Ann Kimble. Ms. Kimble, I'll be asking you a series of questions, please. I'd like for you to elaborate as much as possible on the descriptive questions that I will be asking you. First I'd like to ask you, are you giving this statement of your own free will?

A Yes.

Q Have you been promised anything, money or any gratuities from the defendant, Mr. Fermando Johnson, or any family member of his?

A No.

Q Okay. This statement is in reference to Mr. Fermando Arthur Johnson. Are you familiar with Mr. Johnson?

A I'm familiar with him somewhat through my fiance but he's dead now.

Q Okay.

A They are cousins and—you know.

Q Okay. And you said through your fiance?

A Yeah.

Q Okay. Who is your fiance?

A He was Mr. Willie McGee.

Q Okay. And you say him and Mr. Johnson were—

A Cousins.

Q Okay.

A I would see him from time to time, you know. He would talk about his cousin, this and—you know, he was going to business school, I knew that much.

Q Uh-huh.

A Uh-huh.

Q And how long have you known Mr. Johnson?

A We were together for going on five years and I must have known him about three of those.

Q Okay. All right, you're familiar with Mr. Johnson's present situation that's occurring in El Paso, Texas?

A Yes, I am now.

Q Okay. Can you tell me in your own words, what is your knowledge of that situation?

A Of him being there?

Q Yes.

A Is that he shouldn't be there.

Q Okay. Could you just tell me to your knowledge how you know about him being incarcerated?

A Well, someone told me.

Q Okay.

A Someone told me that he was locked up and then I found out why, and then I realized what he's locked up for is something that I had to—control over.

Q Okay. What were you told by your friend, the situation with Mr. Johnson?

A That he was being charged with drugs, possession of drugs or something. They

don't really know what I know, that he's locked up for the drugs that I had.

Q Okay. How did you know that they were your—they were—you're responsible for the drugs?

A Because of where they were, this is where my fiance had put them and I know they was mine. I know they're mine. You know your own because I was looking for it, and she had rented a car and everything, you know, it's the same car. It couldn't have been nobody else's but mine.

Q Okay. Now, explain to me the situation where you know that the drugs Mr. Johnson was arrested for belonged to you, can you explain to me how you are familiar with that?

A How I'm familiar with the drugs itself?

Q Yes.

A When I—my van, I had a van that broke down, right. When it did break down, she got the car and the drugs are wrapped up in duct tape. They are wrapped under and they are like square shaped, rectangular, rectangular more so than square. It's powder.

Q Okay.

A It's powder.

Q You say your van broke down. Where did it break down?

A In West Memphis, Arkansas.

Q Okay. And you mentioned she, who is she?

A Kim.

Q Kim?

A Kim Washington.

Q Okay. And what relationship is Ms. Washington to you?

A She's absolutely none, she's no relationship to me, but we kind of got along with each other, and the reason why she rented me a car is because I don't have a credit card, and I found out you have to have a credit card to get a car.

Q So Ms. Washington rented you a car?

A She did this under faith that I was going somewhere else. I had lied to her. She did this under trust in me and I misled both of them. I misled both of them. I couldn't get my stuff back.

Q Okay. Now, where was that car rented, was it rented here or was it rented in West Memphis?

A Enterprise.

Q Was it—

A When I asked her where it was because I wanted to go get my stuff, you know, because she didn't—they didn't know about this.

Q Uh-huh. Now, you say Ms. Washington rented the car for you?

A Uh-huh.

Q Okay. Where did you go in the rental car when she rented it for you?

A I never got to get to—to get rid of it. I just drove around town for a while.

Q Okay.

A Just around.

Q Okay. When Ms. Washington rented the car and brought it to you, where did you go in the rental car?

A Around town.

Q Just around Memphis?

A West Memphis.

Q Around West Memphis?

A West Memphis, uh-huh.

Q Okay. How long did you keep the rental car?

A Maybe a day or so, more than a day because she needed it back. She needed her car back. She needed to turn it back in.

Q What were you going to do with the rental car?

A I wasn't going to keep drugs in my house, so I put them in the car, safe place, was a safe place in the car. You could hide them. You couldn't see them just by looking in the car, yeah.

Q So you rented the car. Did you rent the car specifically to put the drugs in?

A Specifically for this cocaine.

Q Okay. And you mentioned that you put the car—put the drugs in the car. What type of drugs was it?

A Cocaine, powder.

Q It was powdered cocaine?

A Yes.

Q How much was it?

A Now, it should have—I never really got to handle it and everything, but it should have been about 22 pounds. That's what it should have been.

Q Okay. And how was that cocaine packaged?

A In duct tape.

Q How was it packaged, was it just the powder—

A Wrapped tight.

Q Okay. Wrapped with what, what was it packaged in?

A Now, that ain't how you buy drugs.

Q What I'm saying is, how did you package the drugs and put it in your car, were they put in paper or—

A They were packaged in some—when you get ready to buy drugs, they come to you with the Saran Wrap, okay, and that's where you do your testing. When you test it, then they come to you with just abundance and if you want to buy it, that's what you buy.

Q Okay, the drugs were in Saran Wrap, 22 pounds. Was it packaged individually or how was it packaged?

A It was individual, about nine of them, should have been about nine, ten of them.

Q It was nine—

A That's how it was.

Q Bundles that were packaged?

A Uh-huh.

Q Were they packaged, you say, in Saran Wrap?

A Uh-huh.

Q Okay.

A Wrapped in duct tape, really tight, really tight. You couldn't see through it or anything.

Q Okay, how many packages did you say it was approximately?

A About nine of them, about nine, nine.

Q Okay. Whose drugs were they? Did the drugs belong to you?

A They were mine. They were mine. This is something that I invested my money in. This is mine.

Q Okay. Do you sell drugs or did you have plans to sell drugs?

A I had plans to sell them so I could make a profit.

Q Uh-huh. Okay, let me get some more information from you in regards to—you said the drugs—exactly who did the drugs belong to, did they belong to you—

A Me.

Q By yourself?

A Yes.

Q Okay. And your intention was you were going to package the drugs and sell them?

A They were packaged. I was going to sell them.

Q All right. Who actually hid the drugs in the car?

A My fiance.

Q Okay. And what is his name?

A Willie Ralph McGee.

Q Okay, is he a friend of Mr. Johnson's?

A They are cousins.

Q Okay. They are cousins.

A Yep.

Q All right. And—

A And see, they don't—I don't think that they would ever think that we would have done something like that.

Q Okay. Exactly—you say Mr. Johnson—not Mr. Johnson but McGee, hid the cocaine?

A No, he just took out the back of the car, the rental car. He just took it out and then I put some on this side and some on that side and, you know, he put it back together.

Q Okay. Exactly what—you say he took it apart, where exactly—did you see him put it in the car?

A You know in the back seat against the window?

Q Okay.

A On both sides.

Q In the back seats against the window on both sides inside the car?

A You know your arm rest, that little part there.

Q Okay.

A Yeah.

Q And you actually saw Mr. McGee—

A Yes.

Q Place it in there?

A No, I did that.

Q Okay. You placed it in—

A Because by him being—he was overweight and he would just—he was—he was out of breath all the time, you know, so he didn't want to just do too much but he did this because I'm trying to get mine done.

Q Okay. I want to get a description of how he—of how you put the drugs in the car and how they were placed in the car. Were they—you say they were put in the arm rest in the back seat?

A No, the rear paneling, the paneling against where you run your arms up.

Q Okay, inside—

A Because it was a two door car, you know. In a two door car, you don't have what four door cars have in the back seat. You know, they have ash trays and doors and all of that in a four door car but in a two door car, they've got something you can lean your head up against. That's what he took out, and that's where I stacked these bundles at.

Q Okay. Who was the cocaine going—was it going to be delivered to someone specifically?

A No one in particular.

Q Okay. This cocaine was just for sale on your own, what you were going to do?

A Right.

Q Okay. Why did you borrow the car from Kim, any particular reason why you used her?

A It was a rental car.

Q You used—

A It was—yeah, I thought it would have been easier because I never had been caught before, you know. I thought it would have been easier to do it like this because I don't want to fix up my van. My van was too big anyway, it was running bad.

Q Okay. Have you ever been arrested before for drugs?

A Never.

Q Okay. You have no arrest history in the United States?

A No.

Q Okay. Why didn't you get the cocaine out of the car when Kim picked the car up?

A Because I didn't want her to know it. I figured I could go back and rent the car again, you know, and get her probably to rent that same car again, there it is.

Q Uh-huh. Okay. Why didn't you get the cocaine out of the car after Kim left the car? You know, Kim dropped the car off at the rental car place, why you didn't try to get it back then?

A Because it's just something you don't want everybody to know. I'm not going to just go to the rental place and say, hey, I've got my stash in here and I need to get my stash out of here.

Q Uh-huh. I'm just saying if it was, you know, something of that value, did you ever try to—

A Yes, I did. Yes, I did.

Q You did go around—

A And every time I went to Enterprise, every time I went to Enterprise, they rented the car out. It wasn't there. It just wasn't there, so . . .

Q Okay. You said that the car was rented. Was the car rented a second time to Ms. Washington to your knowledge?

A No, not to my knowledge, it wasn't.

Q Okay. This is the same car, now, that Mr. Johnson was in?

A The Cavalier.

Q Right.

A Yes.

Q Did they keep the car all that time or did they turn it back in to Enterprise to your knowledge?

A To my knowledge, she had to turn it back in.

Q Okay. So it was there all that time?

A So it had to rush and leave me so she could go and take care of her business so she could stay straight.

Q Okay. I'm going to ask you some biographical questions if I can. Would you please state your full name for the record for me?

A Dimetrius Ann Kimble.

Q Okay. Ms. Kimble, give me your full address?

A My present address is 1900 Van Buren, two words, West Memphis, Arkansas, 72301.

Q Okay. Give me your Social Security number, please?

A 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.

Q Okay. Is Kimble going to be your maiden name or is that a married name?

A Maiden.

Q That is your maiden name?

A Uh-huh.

Q Okay. And your date of birth?

A 7-10, July 10, 1970.

Q Okay. Is there anything else that you can add to this statement that will assist us in this investigation?

A Yes, something that I know he don't know.

Q Okay. What is that?

A Is that the bundles itself was in duct tape, I mean, he didn't know that. He shouldn't have known that it was in the back, in the rear paneling. He shouldn't have known that it's 22 or just about 22 pounds. Maybe he didn't know that. I don't know what he knew. All I know is he is locked up for nothing, for absolutely no reason because he didn't do this.

Q Okay. And it's your contention that the cocaine that was found in the car that Mr. Johnson was arrested in was actually your cocaine and you placed those drugs in the car?

A Yes, I did, sir.

Q Okay. All right. Do you have an active telephone number also?

A It's my mom's, like a message phone.

Q That's fine. What is it?

A 870 is the area code, 733-0331.

Q Okay. This is going to be the end of the statement of Ms. Dimetrius Kimble. That's it.

### END OF STATEMENT

*CERTIFICATE*

STATE OF TENNESSEEè)

COUNTY OF SHELBYè)

I, ELIZABETH T. BUSH, RPR, a Notary Public, hereby certify that the foregoing Sworn Statement was taken before me at the time and place specified in the caption hereof, and the said witness was first duly sworn by me.

I further certify that the testimony of said witness was taken down in stenograph by myself and thereafter transcribed and reduced to typewriting under my direction, and constitutes a full, true and correct record of the foregoing deposition.

I further certify that I am not agent, attorney or counsel for any of the parties, and that I am in no way interested in the event of the cause named in said caption.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal this 5th day of June, 1998.

/s/ Elizabeth T. Bush

NOTARY PUBLIC AT LARGE

MY COMMISSION EXPIRES:

MARCH 16, 1999.